Kenneth R. McCLARY, Plaintiff,

v.

James WALSH; Stephen Leara; Lange, Simpson, Robinson, & Somerville, LLP, Defendants.

No. CV–99–BU–1407–S.

United States District Court, N.D. Alabama, Southern Division.

July 25, 2000.

Patrick M. Lamar, Huntsville, AL, Andre M. Toffel, Andre M. Toffel PC, Birmingham, AL, Tazewell T. Shepard, III, Tazewell Shepard PC, Huntsville, AL, for plaintiff.

W. Stancil Starnes, Bryan O. Balogh, Starnes & Atchison LLP, Birmingham, AL, for defendants.

## DISCOVERY ORDER

PUTNAM, Chief United States Magistrate Judge.

This cause is before the court on the plaintiff's motion to compel discovery (Doc. 42), filed June 13, 2000, and referred to the undersigned on June 15, 2000. The principal issue is whether the requested discovery materials are shielded from disclosure because they fall within the attorney-client privilege claimed and asserted by defendants' former clients Jimmy C. Parks, Jimmy D. Parks, and Parks & Sons Excavating, Inc. (referred to herein collectively as "Parks").

### Background

Plaintiff is a former client of the defendant attorneys. He filed suit against them on several theories principally sounding in legal malpractice, breach of fiduciary duty, and fraud, arising out of transactions between him and Parks arranged by defendants. Without deciding the truth of the allegations, plaintiff alleges that defendants had long represented Parks and had represented him in unrelated matters. One of the matters in which defendants represented Parks was a lawsuit against the Ford Motor Company that had the potential to be quite lucrative. Defendants were aware that Parks was experiencing financial problems that could lead to bankruptcy and the loss of the Ford litigation. Following the collapse of the sale of the business to Appalachian Transport, Inc., on or about October 16, 1997, defendants and Parks's accountant, Tom Aderholt (who also had done work for plaintiff), telephoned plaintiff, whom they knew from their prior representation of him to be a wealthy man, to solicit an extension of credit from him to Parks. Defendants proposed to secure plaintiff's loan with a second mortgage on real estate known as Pine Island Bluff, near Lake Guntersville. Plaintiff alleges that he was told the property was worth more than a million dollars and that the first mortgage was only a small mortgage owed to AmSouth Bank in the range of $50,000 to $60,000. Plaintiff agreed to make a $100,000 loan to Parks.

On October 17, 1997, defendants forwarded a "conflict waiver" letter to both Parks and plaintiff, explaining that defendants could not represent both parties in the loan transaction and proposing to represent only plaintiff. Both Parks and plaintiff agreed and consented. That same day, defendants prepared and the parties executed a promissory note from Parks to plaintiff in the amount of $100,000, a mortgage and security agreement on the Pine Island Bluff real property in favor of plaintiff, and various corporate resolutions evidencing Parks's intent to execute the loan documents. Plaintiff wired $100,000 from his home in South Carolina to Parks's account. Over the next several weeks and months, plaintiff extended additional credit to Parks in three increments of $25,000 each.

Plaintiff also alleges that he, while represented by defendants, reached an agreement to "factor" Parks's accounts receivable. Under this arrangement, as Parks performed trucking work, the invoice for the work

would be "sold" to plaintiff at a discount and plaintiff would then collect the invoice from the customer for whom the work was performed. This enabled Parks to be paid almost immediately for work performed, resulting in improved cash flow. The arrangement called for a higher than normal discount rate to enable plaintiff to recoup his loan to Parks sooner. Plaintiff alleges that he understood that defendants were to prepare the appropriate documents for him to carry the factoring arrangement into effect and, in fact, defendant Leara did prepare and file a UCC–1 financing statement on Parks's accounts receivable to secure the factoring arrangement in February 1998. As early as August 1998, however, plaintiff began to suspect that a number of invoices factored to him were fraudulent.

Plaintiff alleges that during the time the loans were extended to Parks and the factoring arrangement was in place, Parks was actually being operated by defendants. Plaintiff alleges that defendants were no longer just Parks's attorneys and legal advisers, but, in fact, had physically taken over the daily operation of the business on October 15, 1997, directing the payment of creditors and making other daily business decisions. The sworn testimony of Jimmy Parks and DeWayne Parks, during the § 341 hearing in Parks's bankruptcy, confirms that large sums of money raised and borrowed by Parks were delivered to defendants to be paid to Parks's creditors as defendants directed. Plaintiff contends that defendants did so in a desperate attempt to save Parks from bankruptcy in order to preserve their investment in the on-going Ford litigation. Plaintiff asserts that defendants feared that if Parks went bankrupt they would lose control of the Ford litigation to the trustee in bankruptcy.

Ultimately, Parks did go bankrupt in November 1998, and defendants did lose control of the Ford litigation but not before seeking unsuccessfully to have the bankruptcy court appoint them as counsel for the trustee to handle the litigation. Plaintiff then began to discover a number of things disturbing about the transactions. First, plaintiff discovered that the mortgage he received on the Pine Island Bluff property, in fact, was on only part of the property and that his was only the *fifth* mortgage in line, not the second. In addition to the AmSouth mortgage he was advised of, Commerce Bank also held a $100,000 mortgage on the property. Additionally, Parks's accountant, Tom Aderholt, and defendants themselves held mortgages totaling $150,000 superior to plaintiff's. Although defendants subsequently released their mortgage, they did so only after securing another mortgage in their favor on the part of the Pine Island Bluff property not covered by plaintiff's mortgage. Further, he discovered that neighbors near the Pine Island Bluff property had sued to stop development of the property, a fact he was not told when the property was offered as security for the loan he extended, and that he had been joined as a defendant in the litigation because of his mortgage position. It also came to light that as much as $160,000 worth of invoices sold to plaintiff under the factoring arrangement were fraudulent, having been presented to him for payment although no actual work had been performed for any customer. A former secretary at Parks has testified by affidavit that Parks sent fraudulent invoices to plaintiff for factoring for several months and, additionally, that Parks was collecting directly from customers on accounts already factored to plaintiff. She testified that in May or June 1998, prior to Park's bankruptcy, she telephoned defendant Walsh and told him about the fraudulent invoices being sent to plaintiff, but Walsh only replied that he did not want to know anything about it.

The court stresses that these are the allegations of the plaintiff and not a finding of fact made by the court. Whether these allegations ultimately will prove out to be the facts remains to be seen. They are recited here, however, to set the context in which the attorney-client privilege issue is to be addressed.

### Discovery Requests

Plaintiff's discovery request to defendants seeks production of documents in five distinct categories: (1) all documents relating to the October 1997 loan transaction by which plain-

tiff loaned $175,000 to Parks; (2) all documents relating to the creation and execution of the "factoring" arrangement between Parks and plaintiff; (3) all documents relating to the Pine Island Bluff property given as security for the loan made to Parks by plaintiff; (4) all documents relating to "any expenses paid for, or in behalf of Parks & Sons Excavating, Inc., by Lange, Simpson, Robinson and Somerville, LLP, that relate to any litigation or other legal services provided to" Parks; and (5) all documents relating to any expenses paid to, for, or in behalf of Parks by defendants for operating, business, or personal expenses incurred by Parks unrelated to litigation or other legal services provided by defendants. Defendants have objected to these document requests on the ground that all implicate the attorney-client privilege claimed by Parks and arising from defendants' representation of Parks on legal matters other than the dealings directly between Parks and plaintiff. Plaintiff makes clear that, by use of the term "documents," he is seeking correspondence and memoranda between Parks and defendants, and any other piece of paper or stored computer data falling within the described requests.

### Attorney/Client Privilege

Because the rule of decision in this diversity case is supplied by Alabama state law, the law of privileges also comes from state law. *See* FRE 501. The Alabama law regarding the attorney/client privilege now is embodied in Rule 502 of the *Alabama Rules of Evidence.* The committee comments following the rule state that "This rule, consequently, supersedes the preexisting statute." Nevertheless, much of the case law that developed under the common-law first and, then, the statute remains instructive when interpreting the scope and substance of Rule 502.

▬ The statement of the privilege found in Rule 502 is the following:

A client has a privilege to refuse to disclose and to prevent any other person from disclosing a confidential communication made for the purpose of facilitating the rendition of professional legal services to the client, (1) between the client or a representative of the client and the client's attorney or a representative of the attorney, or (2) between the attorney and a representative of the attorney, (3) by the client or a representative of the client or the client's attorney or a representative of the attorney to an attorney or representative of an attorney of another party concerning a matter of common interest, (4) between representatives of the client and between the client and a representative of the client resulting from the specific request of, or at the express direction of, an attorney, or (5) among attorneys and their representatives representing the same client.

*Alabama Rule of Evidence* 502(b). To be privileged against disclosure, therefore, a communication between a lawyer and a person must meet several criteria; not every communication between a lawyer and another person is privileged. *Hunt v. State,* 642 So.2d 999, 1033 (Ala.Crim.App.1993). First, there must exist an attorney/client relationship, that is, there must be an understanding between the parties to the communication that the lawyer has assumed certain legal responsibilities to advise and guide the client on legal matters. *See Bassett v. Newton,* 658 So.2d 398, 402 (Ala.1995); *Ex parte Clark,* 630 So.2d 493, 496–97 (Ala.Crim.App.1993). Second, there must be a communication. The mere delivery of documents to an attorney by a client, for example, does not shield the documents behind the attorney/client privilege. The act of delivering the documents is not communicative. *Ex parte Clark,* 630 So.2d 493, 497–98 (Ala.Crim.App. 1993). Third, the communication must be intended to be confidential; communications that are themselves intended to be further communicated to others outside the privilege or which must be publicly disclosed as part of the attorney's duty to the client are not privileged. *Ex parte Griffith,* 278 Ala. 344, 350–51, 178 So.2d 169, 176–77 (1965), *cert. denied,* 382 U.S. 988, 86 S.Ct. 548, 15 L.Ed.2d 475 (1966); *Ex parte Clark,* 630 So.2d 493, 495 (Ala.Crim.App.1993). The burden of proving that a particular communication comes within the privilege rests on the party asserting the privilege, not on he who is seeking the information. "Whether the

party who asserts the attorney-client privilege is the attorney or the client, the party must establish (1) the presence of an attorney-client relationship, (2) the facts which demonstrate the communications were within the privilege, and (3) the prejudicial effect to the client which would result from any disclosure of the privileged information. *Swain v. Terry*, 454 So.2d 948 (Ala.1984)." *Ex parte McDuffie*, 624 So.2d 1063, 1065 (Ala.1993); *see also Hunt v. State*, 642 So.2d 999 (Ala. Crim.App.1993); *Ex parte Clark*, 630 So.2d 493, 495 (Ala.Crim.App.1993) ("The burden of establishing the privilege rests with the client or with the party objecting to the disclosure of the communication.").

Even if a *prima facie* showing of a privileged communication is made, Rule 502 recognizes a number of exceptions that can make otherwise privileged information unprivileged. The main one of these is the crime/fraud exception. Rule 502(d)(1) states that there is no privilege "[i]f the services of the attorney were sought or obtained to enable or aid anyone to commit or plan to commit what the client knew or reasonably should have known to be a crime or fraud." The Alabama courts have explained:

> In *Ex parte Griffith*, 278 Ala. 344, 350–51, 178 So.2d 169, 176–77 (1965), cert. denied, 382 U.S. 988, 86 S.Ct. 548, 15 L.Ed.2d 475 (1966), the following observations were made:
>
>> "Whether a communication by a client to his attorney is privileged is a question of fact to be determined by the court. A witness, be he attorney or client, is not entitled to decide the question for himself. Thornton on Attorneys at Law, Vol. 1, Section 96, and authorities therein cited.
>>
>> "There are limitations on the application of the rule of privileged communications. As pointed out in *Sawyer v. Stanley*, 241 Ala. 39, 1 So.2d 21, the perpetration of a fraud is outside the scope of professional duty of an attorney, and that the great majority of cases hold that the privilege 'protecting communications between attorney and client is lost if the relation is abused, as where the client seeks advice that will serve

him in the commission of a fraud.' The reason for this exception to the general rule is that if a client discloses his fraudulent purposes, and the attorney refuses to be connected with it, there cannot be said to be professional employment, and consequently no privilege accrues; if the client does not disclose his fraudulent purpose, there is no confidential relationship established, and no attaching privilege; if an attorney knowing the facts and fraudulent purpose agrees to aid in the perpetration of the fraud, he then becomes a party to it, and the communications made to him cease to be privileged. Thornton, supra, Sec. 122; 58 Am.Jur., Witnesses, Sec. 517."

*Ex parte Clark*, 630 So.2d 493, 495 (Ala.Crim. App.1993).

### *Discussion*

The applicability of the attorney/client privilege in this case must be analyzed on each separate discovery request. In keeping with this, the five categories of documents requested will be considered separately.

■ A. *Loan Transaction Documents.* This seems to be the easiest of the requests because it is clear that defendants were **not** acting as counsel for Parks on this matter. The conflict-waiver letter signed by both plaintiff and Parks on October 17, 1997, makes very clear that defendants were representing plaintiff, not Parks, in the matter of the formation and execution of the loan. It unambiguously states that "[w]e now propose to represent Mr. McClary...." Because there was no professional relationship between defendants and Parks, insofar as the loan transaction is concerned, a fundamental element of the privilege is missing.

■ There also was a waiver of any attorney/client privilege by Parks. Even if one could argue that such a professional relationship existed prior to the conflict-waiver letter, the acceptance of the arrangement under the letter by Parks must be regarded as a waiver of any attorney-client privilege existing between Parks and defendants. Parks knew that defendants were actively soliciting a loan for Parks from plaintiff, and

in doing so were making certain statements and disclosures to plaintiff to persuade him to make the loan. By acknowledging that defendants were representing plaintiff and not Parks, Parks waived any privilege it may have had with respect to information conveyed to defendants relevant to the loan and its security. Neither Parks nor defendants could logically say that, while defendants were representing *only* plaintiff with respect to the loan transaction, Parks could prevent defendants from disclosing to plaintiff vital information crucial to the decision to make the loan. By agreeing to allow defendants to represent plaintiff in the loan transaction with it, Parks waived any privilege as to information defendants had that was pertinent to the loan. Parks could have refused to accept the conflict-waiver letter and preserve its privilege, but did not do so. Parks's conduct constitutes a waiver of it privilege. "Waiver includes not merely words or conduct expressing an intention to relinquish a known right, but conduct, such as partial disclosure, that would make it unfair for the client to insist on the privilege thereafter. McCormick § 93; 8 Wigmore, Evidence §§ 2327–2329 (McNaughton rev.1961)." *Bassett v. Newton,* 658 So.2d 398, 402 (Ala. 1995). Parks's conduct of allowing defendants to solicit a loan for it and agreeing for defendants to act as plaintiff's lawyer made it unfair for Parks to fail to disclose the information possessed by defendants vital to plaintiff's decision to make the loan.

■ Moreover, and as an alternative ground for granting the motion, the court concludes that there is sufficient evidence to implicate the crime/fraud exception to the attorney client privilege. Parks and defendants acted together to solicit a $100,000 loan for a company that already had one foot in the financial grave without disclosing the severity of Parks's financial situation. Questionable security was presented to plaintiff to induce the making of the loan, with no disclosure of the problems associated with the Pine Island Bluff property offered as security. There is sufficient evidence that Parks and defendants induced plaintiff to part with $100,000 while either actively misleading him or suppressing vital information about the situation he was getting into, to require the privilege to yield here to the search for truth.

Plaintiff's motion to compel will be GRANTED as to this request. Defendants are directed to produce and make available to counsel for plaintiff all documents (and computer records and data) relating in any way to the contemplation, negotiation, formation, preparation, and closing of the loan between Parks and plaintiff, including correspondence with Parks and any other paper evidencing the contemplation, negotiation, formation, preparation, and closing of the loan.

■ B. *Factoring Arrangement Documents.* The evidence proffered here by plaintiff, which has gone unrebutted by defendants, is that the arrangement under which plaintiff was to factor Parks's accounts receivable was part of the overall loan arrangement. The discount rate on the factoring arrangement was unusually high for the purpose of enabling plaintiff to recoup his loan to Parks sooner, thus suggesting that the factoring arrangement was part of the security for the loan or, at least, part of the negotiated method for collection of the loan. Likewise, the fact that defendant Leara prepared the UCC–1 financing statement securing Parks's receivables under the factoring arrangement implies that defendants were representing plaintiff, not Parks, as reflected by the conflict-waiver letter. Thus, plaintiff's motion to compel is GRANTED with respect to all documents relating to the factoring arrangement, and defendants are DIRECTED to produce and make available to plaintiff's counsel all documents (and computer records and data) of any form whatsoever concerning the contemplation, negotiation, formation, preparation, execution, and operation of the factoring arrangement between Parks and plaintiff.

■ C. *Pine Island Bluff Documents.* The same reasoning applies to the Pine Island Bluff property documents—they were part of the loan transaction because the Pine Island Bluff property was offered to plaintiff as security on the loan. Either no professional relationship existed between Parks and defendants on which to base the privilege or Parks waived the privilege by

agreeing to the conflict-waiver letter or the crime/fraud exception to privilege applies. Plaintiff's motion to compel is GRANTED, and defendants are DIRECTED to produce and make available to plaintiff's counsel all documents (and computer records and data) relating to the acquisition, transfers, encumbrances, value, and security of the Pine Island Bluff property, including the circumstances under which it was offered as security for the loan made by plaintiff and the efficacy of the mortgage on the property given to the plaintiff as security.

■ D. *"Case/Client Expense" Documents.* The documents requested here seem to fall into two categories: first, those documents reflecting payments, like checks, drafts, and the like issued by defendants to pay case or legal-related expenses of Parks, and, second, documents reflecting the underlying motivations or intentions of the parties, like correspondence and file memoranda. As to the former type, Alabama law is very clear that the attorney/client privilege simply does not extend to payment records.

> Bank records of receipts and disbursements in lawyers' trust accounts are not privileged communications. *Securities & Exchange Commission v. First Security Bank,* 447 F.2d 166, 167 (10th Cir.1971), cert. denied, 404 U.S. 1038, 92 S.Ct. 710, 30 L.Ed.2d 729 (1972); *O'Donnell v. Sullivan,* 364 F.2d 43, 44 (1st Cir.), cert. denied, 385 U.S. 969, 87 S.Ct. 501, 17 L.Ed.2d 433 (1966); *Harris v. United States,* 413 F.2d 316, 319–20 (9th Cir.1969); *Goldberg v. Ross,* 421 So.2d 669 (Fla.Dist.Ct.App.1982).

> > "The [attorney-client] privilege extends 'to the substance of matters communicated to an attorney in professional confidence.' The deposit and disbursement of money in a commercial checking account are not confidential communications."

*Ex parte Clark,* 630 So.2d 493, 497 (Ala.Crim. App.1993). Neither Parks nor defendants can argue that the *fact* of payment of expenses, whether by Parks or defendants, is covered by the privilege; there is no communicative element. Just as Parks could be required to identify the expenses it has paid in an appropriate motion, expenses paid for Parks by defendants also can be disclosed. Thus, insofar as this document request seeks only records concerning the payment of case and client related expenses for Parks by defendants, the motion to compel is GRANTED, and defendants are DIRECTED to produce and make available to plaintiff's counsel all documents (and computer records and data) reflecting the payment of litigation and legal-related expenses for Parks by defendants.

The other category of documents possibly sought under this request concerns the motivations, thoughts, and intentions of defendants and Parks as reflected, perhaps, in correspondence and file memoranda. Except for expenses associated with the loan transaction, factoring arrangement, and Pine Island Bluff mortgage, the expenses paid by defendant for Parks in other matters clearly come within the attorney/client relationship between them. Communications regarding these payments also would be within the professional relationship and appear to be privileged. There is no reason to conclude that correspondence or memoranda regarding expenses paid by defendants in matters unrelated to the direct dealings with plaintiff were part of a fraudulent scheme so as to bring them within the crime/fraud exception. The court notes, of course, that insofar as such documents might be regarded as detailing the financial condition of Parks around the time of the loan by plaintiff, they may come within the waiver of privilege discussed above in paragraph A and, of course, would be subject to disclosure under that waiver. Otherwise, however, correspondence, file memoranda, and other documents pertaining to the payment of litigation and legal-related expenses by defendants in completely distinct matters appears to be privileged and the motion to compel is DENIED except as provided above.

■ E. *"Operating, Business, and Personal Expense" Documents.* The final document request also breaks down into two sub-categories: that request seeking only actual receipt and payment records and that request seeking correspondence, file memoranda, and other documents reflecting the motivations and intentions of Parks and de-

fendants. The same ruling and rationale apply. Actual receipt and payment records, showing money delivered to defendants and disbursed by them for Parks's operating, business, and personal expenses are not covered by the privilege. *Ex parte Clark*, 630 So.2d 493, 497 (Ala.Crim.App.1993). To the extent that plaintiff seeks only such receipt and payment records, the motion to compel is GRANTED, and defendants are DIRECTED to produce and make available for plaintiff all documents (and computer records and data) reflecting actual receipts and disbursements by defendants of moneys for operating, business, and/or personal expenses of Parks. On the other hand, the motion to compel is DENIED as to any documents, correspondence, file memoranda, or other papers reflecting communications or advice by and between Parks and defendants about the payment of such expenses. This denial is without prejudice to plaintiff seeking these documents at a later time, if he is able to establish that defendants' relationship with Parks became something other than that of attorney to client. *See Ex parte Clark*, 630 So.2d 493, 497 (Ala.Crim. App.1993) (" '[W]here the attorney acts in any other capacity than as an attorney, such as a depository, or trustee, the attorney-client relationship does not obtain. . . .' *Silverman v. Turner*, 188 So.2d 354, 355 (Fla. Dist.Ct.App.1966).").

### Conclusion

The court agrees with counsel for defendants that the attorney/client privilege is a cornerstone of Anglo–American law, and is virtually sacrosanct. It is not, however, impenetrable, particularly when there is a strong appearance of wrongdoing by the client and attorney that has caused harm to someone else. The disclosures required by this Order shall be made at a mutually agreeable place and time, but not to exceed twenty (20) days from this date. Except as provided herein, the motion to compel is otherwise DENIED.